UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| GRANITE RE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MOUNTAIN MOVERS CONSTRUCTION, INC., MOUNTAIN MOVERS/AINSWORTH-BENNING, LLC, COVENANT HOLDINGS, LLC, COVENANT LANDS LIMITED PARTNERSHIP, AINSWORTH-BENNING OF WYOMING, INC., JACQUELINE A. NETTLETON, JEFFREY L. NETTLETON, <br><br> Defendants. | 5:24-CV-05019-RAL <br><br><br> OPINION AND ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT AND DENYING MOTIONS TO STRIKE |

This case involves a dispute over an indemnity agreement between a surety, Plaintiff Granite Re, Inc. (Granite), and the Defendants, all of whom signed the indemnity agreement. Based on the indemnity agreement, Granite issued a payment bond on a federal construction project. The indemnity agreement requires Defendants to indemnify Granite for losses and expenses it incurs by reason of having issued the payment bond. A subcontractor made claims and received two payments under the payment bond, sued Granite and one Defendant, and prevailed in part in arbitration. Granite is now suing for reimbursement for payment, costs, and legal fees under the indemnity agreement.

The Defendants are Mountain Movers Construction, Inc. (MMCI), Mountain Movers/Ainsworth-Benning (MM/A-B), Covenant Holdings, LLC, Covenant Lands Limited

1

Partnership, True North Consulting, Jaqueline Nettleton, and Jeffrey Nettleton.  MMCI and MM/A-B (collectively "Mountain Movers")[1] counterclaim against Granite for breach of the implied covenant of good faith and fair dealing and tortious interference.  For the reasons explained below, this Court grants Granite's motion for summary judgment on Mountain Movers' counterclaim and the payments Granite made to the subcontractor, but otherwise denies the motion without prejudice to Granite filing a second motion for summary judgment, after further discovery is allowed, on the attorney's fees and expenses it incurred in investigating the bond claim and the related litigation and arbitration.

## I.      Facts

This Court takes the facts primarily from those portions of Granite's statement of material facts not being disputed by Defendants, with a few caveats.  First, this Court considers a fact undisputed when it is properly supported in the record and Defendants merely reference other facts that do not show Granite's fact is genuinely disputed.  See, e.g., Doc. 53 ¶¶ 24–25, 35, 38–39, 51, 72; Danielson v. Huether, 4:18-CV-04039, 2021 WL 217706, at *7 (D.S.D. Jan. 21, 2021) (considering a fact undisputed under this Court's local rules where the nonmoving party's objections concerned minor quibbles with wording or referenced other facts that did not undermine the accuracy of the initial statement); Atmosphere Hosp. Mgmt., LLC v. Shiba Invs., Inc., 158 F. Supp. 3d 837, 853 (D.S.D. 2016) (deeming a fact admitted where the opposing party's objection was not responsive to the initial fact).  Second, this Court ignores the legal conclusions in Defendants' Statement of Additional Material Facts.  See Doc. 53 ¶¶ 1–2, at 37–39; Davis v. City of Little Rock, 122 F.4th 326, 332 (8th Cir. 2024) ("On summary judgment, courts consider only

---

[1] MMCI is the sole member of MM/A-B.  Doc. 19 at 8.

admissible evidence and disregard portions of various affidavits and depositions that purport to state legal conclusions as fact." (cleaned up and citation omitted)).

MM/A-B contracted with the United States Army Corps of Engineers (USACE) in the Fall of 2014 to perform work on the emergency gate control systems of the Fort Peck Dam in Montana. Doc. 45 ¶¶ 7–8; Doc. 53 ¶¶ 7–8; Doc. 54-17 at 1. As with many contracts for federal construction projects, this contract required MM/A-B to furnish a payment bond.[2] Doc. 54-17 at 1. Defendants thus entered into a General Agreement of Indemnity (Indemnity Agreement) with Granite in early December 2014 as consideration for Granite's issuance of suretyship bonds. Doc. 45 ¶ 3; Doc. 53 ¶ 3; Doc. 1-1. Paragraph 2 of the Indemnity Agreement obligates Defendants to indemnify Granite for any loss, cost, expense, and counsel fee Granite sustains "by reason of having executed or procured the execution of said bonds." Doc. 1-1 at 1; Doc. 45 ¶ 6; Doc. 53 ¶ 6. The Indemnity Agreement also includes a right-to-settle and prima facie evidence clause in Paragraph 5: "[Granite] shall have the right to pay, settle or compromise any expense, claim or charge of the character enumerated in this agreement, and the voucher or other evidence of such payment shall be prima facie evidence of the propriety thereof and of the Indemnitor's liability therefore to [Granite]." Doc. 1-1 at 1; Doc. 45 ¶ 6; Doc. 53 ¶ 6. Granite issued a payment bond for the Fort Peck project in late December 2014 listing MM/A-B as the principal. Doc. 45 ¶ 12; Doc. 53 ¶ 12; Doc. 48, Ex. 8.

---

[2]The Miller Act requires government contractors like MM/A-B to obtain a payment bond to protect "all persons supplying labor and material in carrying out the work provided for in the contract." 40 U.S.C. § 3131(b)(2). "Because subcontractors may not impose a lien on government-owned property, the Miller Act ensures that they can recover for materials and labor contributed to public projects." Consol. Elec. & Mechs., Inc. v. Biggs Gen. Contracting, Inc., 167 F.3d 432, 434 (8th Cir. 1999).

Trouble developed between Mountain Movers and their main subcontractor,[3] Yellow Stone Electric Co. (Yellowstone), early in the Fort Peck project. Yellowstone sent a letter to the USACE in April 2015 complaining that MM/A-B was over 60 days late in making full payment on Yellowstone's invoice.[4] Doc. 45 ¶ 13; Doc. 53 ¶ 13; Doc. 48, Ex. 9. Yellowstone copied the USACE on additional complaints of nonpayment dated March 31, 2016, and May 11, 2016. Doc. 45 ¶ 15; Doc. 53 ¶ 15; Doc. 48, Exs. 10, 11. Yellowstone's May 11 complaint threatened to stop work if MM/A-B did not pay it for a past due amount. Doc. 48, Ex. 11. The USACE sent a letter to MM/A-B on May 26, 2015, discussing the USACE's receipt of Yellowstone's "concerning" May 11 message. Doc. 45 ¶ 16; Doc. 53 ¶ 16; Doc. 48, Ex. 12.

Yellowstone asked to open a claim on the Fort Peck payment bond in Spring 2016. Doc. 45 ¶ 23; Doc. 53 ¶ 23; Doc. 48, Ex. 20. Granite asked Yellowstone for evidence supporting its claim while also notifying Defendants of the claim and seeking their position on it. Doc. 45 ¶¶ 24–25; Doc. 53 ¶¶ 24–25; Doc. 48, Ex. 21, Ex. 22, Ex. 23, Ex. 50 at 7. In August 2016, Yellowstone provided Granite with copies of the subcontract, executed change orders, payment applications, and an updated invoice, claiming a balance due of $334,287. Doc. 45 ¶ 26; Doc. 53 ¶ 26; Doc. 48, Ex. 24. Granite again sought MM/A-B's position on these documents, though Defendants contend that Granite did not reasonably assess the information they provided or reasonably consider their rights under the subcontract with Yellowstone. Doc. 45 ¶ 27; Doc. 53 ¶ 27; Doc. 48, Ex. 25.

---

[3]The USACE contract with Mountain Movers was approximately $2.4 million, and Mountain Movers' subcontract with Yellowstone was for approximately $1.9 million.

[4]Defendants dispute that Yellowstone had a valid claim for payment, stating that Yellowstone did not start work on the project until May 2016 and that the April 2015 letter was another example of Yellowstone invoicing for work it hadn't performed. Doc. 53 ¶ 13; Doc. 54 ¶ 7. Defendants likewise dispute the validity of other claims and complaints Yellowstone made about nonpayment. See, e.g., Doc. 53 ¶¶ 15–16, 23, 26. That was the subject of an arbitration in June 2018 and ruling therefrom in March 2023.

Yellowstone and MM/A-B provided Granite with conflicting information about the validity of Yellowstone's claim. Doc. 45 ¶ 28; Doc. 53 ¶ 28; Doc. 48, Exs. 26, 27. MM/A-B's attorney sent a letter on September 1, 2016, contending that Yellowstone's claim was unfounded for several reasons, including that Yellowstone had failed to comply with the subcontract and was submitting pay requests on a schedule of values never approved by the USACE or MM/A-B. Doc. 48, Ex. 26. Granite sent a letter to Yellowstone on September 8, 2016, discussing MM/A-B's September 1 response and denying Yellowstone's claim. Doc. 56-1 at 59–60. Granite wrote that "[t]his is clearly a business dispute the Surety cannot interfere in." Id. at 60. "As a contract surety," Granite explained, "we cannot act as a volunteer where there is a dispute of colorful merit. We feel this matter is a business dispute and until liability is determined by agreement between the parties, the Surety is restrained from interfering in the dispute. To do so may subject us to a claim that our interference prejudiced the rights of either or both parties to the dispute." Id. Yellowstone's attorney responded less than a week later asking Granite to reconsider its decision on the bond claim and arguing that MM/A-B's position was unsupported. Doc. 48, Ex. 27. She wrote that Granite owed Yellowstone a duty to reasonably investigate the claim and that a failure to do so could render Granite liable for actual and punitive damages. Id. at 5.

Given MM/A-B and Yellowstone's disagreement, Granite sought input from the USACE. Doc. 45 ¶ 29; Doc. ¶ 29; Doc. 48, Ex. 28. Granite wrote to the parties in December 2016 explaining that the USACE would be providing a synopsis of their positions. Doc. 53 ¶ 29; Doc. 48, Ex. 28. When the USACE later declined to provide any analysis, however, Granite informed the parties and encouraged them to find common ground through a meeting or mediation. Doc. 45 ¶ 30; Doc. 53 ¶ 30; Doc. 48, Ex. 29. MM/A-B and Yellowstone tried to schedule a meeting in February 2017 but could not agree on the terms. Doc. 48, Ex. 30; Doc. 45 ¶ 31; Doc. 53 ¶ 31.

5

On February 23, 2017, Granite retained consultant Mark Gentry with the Kenrich Group to independently assess Yellowstone's claims. Doc. 45 ¶¶ 32–33; Doc. 53 ¶¶ 32–33; Doc. 48, Ex. 51 at 7; Doc. 54, Ex. 123. Gentry is a registered professional engineer with a degree in civil engineering and construction management. Doc. 45 ¶ 33; Doc. 53 ¶ 33. He previously served as a project manager for JE Dunn Construction and has provided expert consulting services in construction and engineering matters, including issues concerning the amount of completed work and project accounting, and claims in which a bond company was involved. Doc. 45 ¶ 33; Doc. 53 ¶ 33. Granite's Rule 30(b)(6) witness Brad Tollefson testified Granite had hired Gentry because its efforts to resolve the conflict had failed and Yellowstone and MM/A-B were still diametrically opposed. Doc. 48, Ex. 51 at 7. According to Tollefson, Yellowstone's threat of an unfair trade practices claim had no bearing on Granite's decision to hire Gentry. Id. at 8. Defendants view things differently. They point out that Granite only hired Gentry after Yellowstone threatened to bring a bad faith/unfair trade practices claim in letters dated September 14, 2016, October 18, 2016, and February 21, 2017. Doc. 53 ¶¶ 28, 32; Doc. 48, Ex. 27; Doc. 54-2 at 1; Doc. 54, Ex. 214. Defendants argue that Granite's February 24, 2017 letter to Yellowstone shows that Yellowstone's February 21 letter prompted Granite to hire Gentry. Doc. 54 ¶ 22. The February 24 letter assured Yellowstone that Granite intended to act in good faith and that it had hired the Kenrich Group, Gentry's employer, to evaluate Yellowstone's base claim. Doc. 54, Ex. 124. The letter explained that the Kenrich Group was "engaged to evaluate Yellowstone's base claim— subcontract equipment, deliveries, reports, and submittals—irrespective of the parties' competing arguments regarding delays, over-certification of claim, subcontractor payment principles, and the like." Id. at 2.

6

Granite and Defendants disagree about whether this letter accurately describes the scope of Gentry's evaluation. Doc. 45 ¶¶ 34–36; Doc. 53 ¶¶ 34–36. Defendants contend that the letter shows that Granite told Gentry to ignore MM/A-B's reasons for withholding payment from Yellowstone for items such as liquidated damages, scope of work disputes, and nonconforming work. Doc. 55 at 4; Doc. 53 ¶ 34. Defendants assert that Gentry acknowledged these instructions in a July 26, 2017 email. Doc. 53 ¶ 34. The July 26, 2017 email addresses a proof of claim reconciliation that Yellowstone prepared and emailed to Gentry and Granite's attorney. Doc. 54, Ex. 128. Gentry wrote that he had "seen this but intentionally focused on the build-up to the bond claim. Let me know if you want me to look at it differently." Id. at 1.

Tollefson, on the other hand, testified that Granite asked Gentry to gather whatever information from the two parties he deemed necessary and to decide the bond claim based on his expertise. Doc. 45 ¶ 34; Doc. 48, Ex. 51 at 2. Gentry testified that it was not accurate to say that he focused only on Yellowstone's base claim to the exclusion of other issues between Yellowstone and MM/A-B:

> I don't believe that's accurate. . . . [A]s I recall in my evaluations of the bond claims, I think I acknowledged that the project was completed late, and there were competing views on who was responsible for the delays, and provided a—a—a range of possible outcomes dependent upon who was, for example, responsible for the delay that occurred on the project.

Doc. 56-2 at 5. Gentry explained that he also considered disputes about back charges, scope of work, and offsets, and that he conducted an independent assessment of Yellowstone's claims. Id.; Doc. 48, Ex. 52 at 15–16. Regardless of the scope of Gentry's evaluation, there is no dispute that

he spoke with Yellowstone and MM/A-B about the bond claim and requested information from both. Doc. 45 ¶ 35; Doc. 53 ¶ 35; Doc. 48, Ex. 52 at 12–13.[5]

In April 2017, the USACE sent a letter to MM/A-B about a conference it had held to evaluate MM/A-B's performance on the Fort Peck project. Doc. 48, Ex. 17; Doc. 45 ¶ 20; Doc. 53 ¶ 20. The letter explained that MM/A-B's performance was currently considered unsatisfactory, that an interim unsatisfactory rating had been loaded into the Contractor Performance Assessment Reporting System (CPARS), and that this rating would be finalized if performance did not improve. Doc. 48, Ex. 17; Doc. 45 ¶ 20; Doc. 53 ¶ 20; see also Doc. 45 ¶ 21; Doc. 53 ¶ 21; Doc. 48, Ex. 18 (the interim report). Granite filed a declaration from Paul Holcomb, the administrative contracting officer on the Fort Peck Project, stating that he did "not see how the surety acting on either the performance or payment had a negative impact on Mountain Movers reputation or relationship with the [USACE]. The actions or inactions of Mountain Movers would have been the reason for their problems." Doc. 48, Ex. 19 at 1. Defendants dispute that the unsatisfactory rating was justified and argue that Holcomb's statements are lay opinions not based on personal knowledge and are outside his designated authority. Doc. 53 ¶¶ 20, 22.

On July 11, 2017, Yellowstone sued Granite and MM/A-B in federal court in Montana based on Yellowstone's claims of underpayment and unfair trade practices under the Fort Peck payment bond. Doc. 45 ¶ 71; Doc. 53 ¶ 71. The case was later stayed pending arbitration before the American Arbitration Association (AAA). Doc. 45 ¶ 71; Doc. 53 ¶ 71.

Gentry issued his first written report on July 14, 2017. Doc. 45 ¶ 38; Doc. 53 ¶ 38; Doc. 48, Ex. 31. This report addressed Yellowstone's initial August 2016 proof of claim and covered

---

[5]Though Defendants dispute Paragraph 35 of Granite's Statement of Material Facts, they cite nothing that undermines Gentry's testimony that he spoke with and requested information from both parties. See Doc. 53 ¶ 35.

Yellowstone's pay applications one through six. Doc. 45 ¶ 38; Doc. 53 ¶ 38; Doc. 48, Ex. 31. Gentry determined that not all work invoiced by Yellowstone had been completed or was payable at the time of Yellowstone's initial proof of claim, so he identified several downward adjustments to the $334,287 Yellowstone sought. Doc. 45 ¶¶ 38–39; Doc. 53 ¶¶ 38–39; Doc. 48, Ex. 31.[6] Gentry's adjustments included an $89,395 deduction for work completed but not yet payable when the bond claim was made because MM/A-B had yet to receive payment from the USACE; an $11,430 reduction for brakes that had not been removed; a $62,000 reduction for incomplete submittals; and a $26,774 deduction for work that was only partially complete. Doc. 45 ¶ 40; Doc. 53 ¶ 40; Doc. 48, Ex. 31. Gentry concluded that Yellowstone was owed $144,687.81 at the time of the bond claim. Doc. 48, Ex. 31 at 2.

On July 19, 2017, Granite paid Yellowstone $234,082.81. Doc. 45 ¶ 44; Doc. 53 ¶ 44; Doc. 46-1. Granite added back the $89,395 deduction for work completed but not yet payable because the USACE had paid for the work the day after Yellowstone made its bond claim. Doc. 45 ¶¶ 43–44; Doc. 53 ¶¶ 43–44; Doc. 48, Ex. 32.[7] Granite's payment to Yellowstone provided that it was made "under a full reservation of rights by [Granite], including reserved claims for the return of funds as the Court may ultimately determine in ongoing litigation." Doc. 46-1 at 1.

---

[6]Defendants do not dispute the contents of Gentry's report but say that there were "numerous errors in the report" that they called to Gentry's and Granite's attention. See Doc. 53 ¶¶ 38–39. Defendants do not explain what these errors were but rather cite to Jacqueline Nettleton's affidavit and 11 exhibits.

[7]Defendants contend that they notified Gentry that the work had not been performed and that Yellowstone should not receive payment for it. Doc. 53 ¶ 42. Three of the four exhibits Defendants cite in support are communications that occurred after Granite issued the payment on July 19. See Doc. 54, Exs. 143, 144, 146. The fourth exhibit is dated July 19, 2017, and discusses the removal of a thruster brake that Yellowstone invoiced for but had yet to complete. Doc. 54, Ex. 145. Gentry's report deducted $11,430 from Yellowstone's bond claim because Yellowstone invoiced for removing thruster breaks before they did so. Doc. 48, Ex. 31.

Work on the Fort Peck project continued, but so did the payment disputes between Yellowstone and MM/A-B.  On October 10, 2017, Yellowstone submitted a supplemental proof of claim to Granite covering amounts invoiced through pay application 9.  Doc. 45 ¶ 45; Doc. 53 ¶ 45.  Yellowstone claimed that MM/A-B owed it $221,804.44.  Doc. 45 ¶ 45; Doc. 53 ¶ 45; Doc. 48, Ex. 34.  Gentry investigated the supplemental proof of claim and issued a report on December 12, 2017.  Doc. 45 ¶ 46; Doc. 53 ¶ 46.  He concluded that not all work invoiced by Yellowstone had been completed and again identified several downward adjustments to the amount Yellowstone claimed.  Doc. 45 ¶ 47; Doc. 53 ¶ 47; Doc. 48, Ex. 34.  Gentry made a $2,300 deduction for removal of brakes that had not been completed; a $52,000 deduction for submittals that were incomplete; a $13,125 deduction based on Yellowstone's submission of only 1 of 8 factory acceptance test documents; and a deduction for "Extra Work" charges for which Yellowstone failed to provide supporting documentation.  Doc. 45 ¶¶ 47–48; Doc. 53 ¶¶ 47–48;[8] Doc. 48, Ex. 34.  With these deductions, Gentry concluded that MM/A-B owed Yellowstone $35,761.03.  Doc. 45 ¶ 49; Doc. 53 ¶ 49; Doc. 48, Ex. 34 at 2.  Granite gave MM/A-B a copy of Gentry's report and advised that it was prepared to pay Yellowstone if MM/A-B did not.  Doc. 45 ¶ 50; Doc. 53 ¶ 50; Doc. 48, Ex. 35.  MM/A-B then paid Yellowstone the $35,761.03.  Doc. 45 ¶ 50; Doc. 53 ¶ 50; Doc. 48, Ex. 36.  Defendants maintain that MM/A-B only made this payment because Granite demanded that it do so.  Doc. 53 ¶ 50.

---

[8]Defendants' response to Granite's statement of material facts state that MM/A-B notified Granite of its objections to the October 10, 2017 supplemental bond claim and cite 14 exhibits in support without explaining what those exhibits are.  Doc. 53 ¶ 45.  If Defendants are claiming that Gentry failed to consider their objections, it is their duty on summary judgment to explain what those objections are and how Genty fell short.  Defendants also assert that Yellowstone's supplemental claim was premature but cite nothing in the record to support this.  Doc. 53 ¶ 47.

Yellowstone submitted a second supplemental proof of claim in mid-December 2017 and a third supplemental proof of claim in early February 2018. Doc. 45 ¶ 51; Doc. 53 ¶ 51. At the time of the third claim, Yellowstone alleged it was owed $619,553.16. Doc. 45 ¶ 51; Doc. 53 ¶ 51. Gentry investigated the proofs of claim and issued a report on the third claim on May 21, 2018. Doc. 45 ¶ 52; Doc. 53 ¶ 52; Doc. 48, Ex. 37. Gentry made a $39,000 deduction for work he found that Yellowstone had not completed and a $17,925 deduction for "Extra Work" Yellowstone invoiced but did not support. Doc. 45 ¶ 53; Doc. 53 ¶ 53; Doc. 48, Ex. 37. Gentry also evaluated several categories of offsets and damages claimed by MM/A-B. Doc. 45 ¶ 54; Doc. 53 ¶ 54; Doc. 48, Ex. 37. He noted that the USACE could assess liquidated damages totaling $141,100 for delays to the project and that MM/A-B could be entitled to an offset as large as this entire amount if Yellowstone was responsible for the delay. Doc. 45 ¶ 54; Doc. 53 ¶ 54; Doc. 48, Ex. 37. He also noted MM/A-B's concerns about the spillway car motors Yellowstone provided but was unable to confirm whether those motors would need to be replaced. Doc. 45 ¶ 54; Doc. 53 ¶ 54; Doc. 48, Ex. 37. Although Yellowstone had yet to bill for the motors, Gentry included a potential $39,240 deduction should the motors require replacement. Doc. 45 ¶ 54; Doc. 53 ¶ 54; Doc. 48, Ex. 37 at 3. Because Gentry was unable to determine who was responsible for the project delays and whether the motors would need to be replaced, he included both a high ($562,628) and low ($382,288) value of payment owed to Yellowstone. Doc. 45 ¶ 57; Doc. 53 ¶ 57; Doc. 48, Ex. 37.

MM/A-B argued that Gentry should make additional deductions because it was forced to perform hoisting and other tasks that fell within Yellowstone's scope of work. Doc. 45 ¶ 55; Doc. 53 ¶ 55; Doc. 48, Ex. 37. This scope of work dispute arose from Mountain Movers and Yellowstone relying on different versions of "Exhibit A," an attachment to the subcontract setting forth Yellowstone's scope of work. Doc. 45 ¶ 55; Doc. 53 ¶ 55; Doc. 48, Ex. 37. Yellowstone

11

represented to Granite that the scope of work letter and version of subcontract "Exhibit A" that Yellowstone provided were true and accurate. Doc. 45 ¶ 55; Doc. 53 ¶ 55; Doc. 48, Ex. 37. MM/A-B had provided Granite and Gentry copies of the subcontract that included Yellowstone's version of "Exhibit A" in a September 2016 letter and a March 2017 email. Doc. 45 ¶ 55; Doc. 53 ¶ 55; Doc. 48, Exs. 26, 38. In a June 2017 email, however, MM/A-B asserted that the Exhibit A Yellowstone provided was incorrect and included exclusions MM/A-B hadn't seen until Yellowstone's bond claim. Doc. 45 ¶ 55; Doc. 53 ¶ 55; Doc. 48, Ex. 39. Gentry found Yellowstone's argument on the scope of work more compelling given the "contemporaneous records" Yellowstone provided.[9] Doc. 45 ¶ 56; Doc. 53 ¶ 56; Doc. 48, Ex. 37 at 4. He thus refused to make the additional deductions MM/A-B requested. Doc. 45 ¶ 56; Doc. 53 ¶ 56; Doc. 48, Ex. 37.

The Fort Peck project reached substantial completion on March 27, 2018. Doc. 45 ¶ 64; Doc. 53 ¶ 64; Doc. 48, Ex. 42.[10] On May 30, 2018, Granite paid Yellowstone $382,288, the lower amount Gentry had calculated. Doc. 45 ¶ 58; Doc. 53 ¶ 58; Doc. 46-2. Granite's letter to Yellowstone provided that the payment was made "under a mutual reservation of rights by [Yellowstone] and [Granite]." Doc. 45 ¶ 58; Doc. 53 ¶ 58; Doc. 46-2. Citing Tollefson's testimony, Granite contends it made the payments under a reservation of rights so that MM/A-B could still pursue its rights, defenses, counterclaims, and arguments against Yellowstone and the USACE. Doc. 45 ¶ 58; Doc. 53 ¶ 58; Doc. 48, Ex. 51 at 3–4.

---

[9]Jacqueline Nettleton's affidavit asserts that Gentry decided in Yellowstone's favor even though he received "clear evidence" from Mountain Movers that its version of Exhibit A was the true version. Doc. 54 ¶ 30. She does not say what this "clear evidence" was or cite to where it appears in the record. Id.

[10]Defendants note that substantial completion is different from contract completion. Doc. 53 ¶ 64.

The arbitrator in Yellowstone's case against MM/A-B and Granite held an 11-day evidentiary hearing in June 2018. Doc. 45 ¶ 71; Doc. 53 ¶ 71; Doc. 48, Ex. 47. This was Phase I of a planned two-phase arbitration, with Yellowstone's claims against Granite for mishandling the bond claim reserved for a Phase II that ultimately did not occur. During the 11-day hearing, Mountain Movers presented evidence and arguments about: whether Yellowstone's work met the project specifications or was compliant; which of the two versions of Exhibit A controlled the scope of work and the amount of offsets Mountain Movers should receive under Exhibit A; hoisting costs Mountain Movers incurred; delays Yellowstone caused; what payments Mountain Movers had made to Yellowstone; and whether Mountain Movers was entitled to attorney's fees and expert fees. Doc. 45 ¶ 72; Doc. 53 ¶ 72; Doc. 48, Ex. 50 at 12–17. Jacqueline Nettleton, testifying as Mountain Movers' designee, said that Mountain Movers was only able to make some of these arguments "in part" because the arbitrator limited what Mountain Movers wished to present or Mountain Movers did not discover certain facts until after the arbitration. Doc. 45 ¶ 72; Doc. 53 ¶ 72; Doc. 48, Ex. 50 at 12–17.[11] Defendants submit no evidence that Granite prevented them from presenting these arguments and evidence at the arbitration. Doc. 45 ¶ 72; Doc. 53 ¶ 72. Mountain Movers sought damages or offsets from Yellowstone during the arbitration for delay costs and unperformed or noncompliant work. Doc. 45 ¶ 73; Doc. 53 ¶ 73; Doc. 48, Ex. 46. Defendants contend that the arbitrator did not provide full and final relief on some of these damages but agree that Granite did not limit or prevent them from seeking these damages at the arbitration. Doc. 45 ¶ 73; Doc. 53 ¶ 73.

---

[11]Defendants cite to page 12 of the arbitrator's decision to say that Granite's statement of fact ¶ 72 is disputed. Doc. 53 ¶ 72. Though that page says that the arbitrator did not consider certain claims, it does not undermine the accuracy of Granite's statement of fact ¶ 72.

MM/A-B submitted a request for equitable adjustment to the USACE and converted this request to a certified claim in June 2019. Doc. 45 ¶ 65; Doc. 53 ¶ 65; Doc. 48, Ex. 43. The certified claim alleged defective plans and specifications, government caused delays, government breach of the duty of good faith, and other reasons for compensation. Doc. 45 ¶ 65; Doc. 53 ¶ 65; Doc. 48, Ex. 43. MM/A-B sought a $507,083.71 increase to the prime contract price, a 538-day extension of time, release of the remaining contract balance of $181,121.23, and remission of $132,600 in liquidated damages assessed by the USACE. Doc. 45 ¶ 66; Doc. 53 ¶ 66; Doc. 48, Ex. 43. MM/A-B settled with the USACE in October 2022 for $599,733.71. Doc. 45 ¶ 68; Doc. 53 ¶ 68; Doc. 48, Ex. 44.

The arbitrator issued an interim award on Phase I of the arbitration in late March 2023. Doc. 45 ¶ 74; Doc. 53 ¶ 74; Doc. 48, Ex. 47. The arbitrator found in Mountain Movers' favor on the scope of work issue, concluding that the contract line-item number pricing schedule Mountain Movers had attached as Exhibit A when it issued the subcontract to Yellowstone in November 2014 governed Yellowstone's scope of work. Doc. 48, Ex. 47 at 6–7; Doc. 53 ¶ 55. The arbitrator concluded that Yellowstone had attached a revised version of Exhibit A with a reduced scope of work when it returned the subcontract to Mountain Movers. Doc. 48, Ex. 47 at 6. Though Yellowstone based the revised Exhibit A on a "scope" letter dated September 2014, the arbitrator found that Yellowstone created this letter after Mountain Movers had presented Yellowstone with the subcontract. Id. at 6–7.

Turning to the parties' payment disputes, the arbitrator determined that the revised subcontract amount was $1,965,991.86, that Granite's and MM/A-B's payments to Yellowstone totaled $1,230,470.96, and that the balance due to Yellowstone was thus $735,520.90. Doc. 45 ¶ 75; Doc. 53 ¶ 75 Doc. 48, Ex. 47 at 8. The arbitrator awarded Mountain Movers $511,362.89 for

14

its scope of work claims and $2,917.91 for one day of liquidated damages caused by Yellowstone's delay. Doc. 48, Ex. 47 at 9–11. He denied Mountain Movers' warranties claim and claim for miscellaneous additional costs, however. Id. at 11. The arbitrator found that Mountain Movers' bad faith allegations and potential new claims and damages against Yellowstone were outside his jurisdiction. Id. at 12; Doc. 53 ¶ 74. Since the offsets owed to Mountain Movers ($514,280.80) were less than the amount owed Yellowstone ($740,221.72), the arbitrator concluded that Mountain Movers should recover nothing and that Yellowstone was owed $225,940.92 beyond what Mountain Movers and Granite had already paid. Doc. 48, Ex. 47 at 12–13; Doc. 45 ¶ 77; Doc. 53 ¶ 77. Mountain Movers moved to challenge the arbitrator's award but eventually settled with Yellowstone for $170,000 after a settlement conference with a magistrate judge. Doc. 48, Ex. 48; Doc. 45 ¶¶ 78–79; Doc. 53 ¶¶ 78–79; see United States ex rel. Yellowstone Elec. Co. v. Granite Re Inc., 4:17-cv-00065 (D. Mont).

In February 2024, Granite demanded reimbursement from Defendants for the bond payments to Yellowstone, consultant fees, attorney's fees, and other costs it claimed were incurred by reason of having issued the Fort Peck payment bond. Doc. 45 ¶ 80; Doc. 53 ¶ 80. Defendants refused to pay Granite any of the money sought, so Granite sued Defendants in this Court in March 2024 for breach of contract and indemnity. Doc. 1. Mountain Movers counterclaimed against Granite for breach of contract (Count 1), tortious interference with the Yellowstone subcontract (Count 2), and tortious interference with MM/A-B's contract with the USACE (Count 3). Doc. 19.

Granite now moves for summary judgment on its claim for breach of contract and all counts of Mountain Movers' counterclaim. Doc. 43. Granite filed an affidavit from its claims manager Tollefson itemizing the $1,166,675.22 in expenses Granite claims it incurred by reason of having

15

issued the Fort Peck payment bond. Doc. 46. Defendants filed a declaration and expert report from Paul Bailey to support their claim for damages on the Fort Peck project and for the loss of government contracting opportunities. Docs. 57, 57-1, 57-2. True to pattern, both parties move to strike one another's evidence on damages. Docs. 50, 62. Defendants argue that Tollefson's affidavit contains inadmissible evidence and damages that were not properly disclosed. Doc. 51. Granite contends that Bailey's report fails Federal Rule of Civil Procedure 26(a)(2)'s requirements and that the supplemental spreadsheet he provided is untimely and not a proper supplemental report. Doc. 63.

## II.    Standard of Review

Summary judgment is proper under the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Main v. Ozark Health, Inc., 959 F.3d 319, 323 (8th Cir. 2020). The moving party has the initial burden to show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party must establish that a material fact is genuinely disputed by either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); see also Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012).

A party opposing a properly supported motion for summary judgment cannot rely on mere allegations that are unsupported by specific facts or evidence beyond the non-moving party's own conclusions. Eggers v. Wells Fargo Bank, N.A., 899 F.3d 629, 632–33 (8th Cir. 2018). Courts ruling on a summary judgment motion view the facts and inferences fairly drawn from the facts in

the nonmoving party's favor, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986); see also Baker v. Silver Oak Senior Living Mgmt. Co., L.C., 581 F.3d 684, 687 (8th Cir. 2009), but do not "resort to speculation," Baker, 581 F.3d at 687.

## III. Analysis

### A. Granite's Claim for Breach of Contract

The parties apply South Dakota law in this diversity of citizenship jurisdiction case, so this Court does too. Doc. 44 at 10; Doc. 55 at 8; see Netherlands Ins. v. Main St. Ingredients, LLC, 745 F.3d 909, 913 (8th Cir. 2014) ("Because the parties do not dispute the choice of Minnesota law, we assume, without deciding, Minnesota law applies . . . ."); Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry."). The Indemnity Agreement lacks a choice of law provision, and Defendants are from or have Belle Fourche or Piedmont, South Dakota, as their residences or principal places of business. See Docs. 1, 19; Doc. 1-1. A party claiming breach of contract in South Dakota must show "(1) an enforceable promise; (2) a breach of the promise; and, (3) resulting damages." Bowes Constr., Inc. v. S.D. Dep't of Transp., 793 N.W.2d 36, 43 (S.D. 2010). Whether a party breached a contract is generally a question of fact. Weitzel v. Sioux Valley Heart Partners, 714 N.W.2d 884, 894 (S.D. 2006). Contract interpretation, though, is a question of law, with courts seeking to "ascertain and give effect to the intentions of the parties." Pesicka v. Pesicka, 618 N.W.2d 725, 726–27 (S.D. 2000) (citation omitted). "If that intention is clearly manifested by the language of the agreement, it is the duty of this Court to declare and enforce it." Pauley v. Simonson, 720 N.W.2d 665, 668 (S.D. 2006) (cleaned up and citation omitted).

17

Granite argues that Defendants breached the Indemnity Agreement by failing to reimburse it for the costs it incurred because of issuing the Fort Peck payment bond. Paragraph 2 of the Indemnity Agreement requires Defendants to

> indemnify and save [Granite] harmless from and against every claim, demand, liability, loss, cost, charge, counsel fee, payable on demand of Surety, whether actually incurred or not, (including fees of special counsel, whenever by [Granite] deemed necessary) expense, suit, order judgment and adjudication whatsoever, and any and all liability therefore, sustained or incurred by [Granite] by reason of having executed or procured the execution of said bonds or obligations, and will place [Granite] in funds to meet same before it shall be required to make payment, and in case the Indemnitor requests [Granite] to join in the prosecution  or defense of any legal proceeding, the Indemnitor will, on demand of [Granite], place it in funds sufficient to defray all expenses and all judgments that may be rendered therein.

Doc. 1-1 at 1.   The Eighth Circuit has construed similar language in an indemnity agreement— "by reason of having executed any bond" —as setting forth "a simple cause-in-fact or 'but-for' causation test." Spirtas Co. v. Ins. Co. of State of Pa., 555 F.3d 647, 652 (8th Cir. 2009).  This but-for causation test, the court held, was "sufficiently broad" to cover reasonable attorney and expert witness fees the surety incurred in an arbitration involving a claim on the surety bond. Id. at 652–53.  Granite argues that it would not have incurred the following expenses but for having issued the Fort Peck payment bond:

- Payments to Yellowstone;

- Consultant fees, attorney fees, and other costs and expenses incurred in the bond claim investigation, litigation, and arbitration; and

- Attorney and expert fees incurred in this action.

Doc. 44 at 8, 12.

### 1. Payments to Yellowstone

Granite argues that Paragraph 5 of the Indemnity Agreement gave it the right to make the payments to Yellowstone and that Tollefson's affidavit constitutes prima facie evidence of Defendants' liability for these payments. Doc. 44 at 12–16; Doc. 66 at 7–9. Again, Paragraph 5 provides that Granite "shall have the right to pay, settle or compromise any expense, claim or charge of the character enumerated in this agreement, and the voucher or other evidence of such payment shall be prima facie evidence of the propriety thereof and of the Indemnitor's liability therefore to [Granite]." Doc. 1-1 at 1. Defendants do not dispute that Granite paid Yellowstone this money "by reason of having" issued the Fort Peck payment bond. Rather, they argue that there are questions of fact over whether Granite's payments to Yellowstone were in good faith. Doc. 55 at 11–13.

The parties disagree on what constitutes good faith by a surety. Defendants argue that indemnitors can show a lack of good faith when the surety acts negligently or fails to make a reasonable investigation of the claims and defenses before making payment. Doc. 55 at 13 (citing Rush Presbyterian St. Luke's Med. Ctr. v. Safeco Ins. Co. of Am., 712 F. Supp. 1344, 1345–46 (N.D. Ill. 1989); Hartford v. Tanner, 910 P.2d 872, 878–81 (Kan. Ct. App. 1996); City of Portland v. George D. Ward & Assocs., 750 P.2d 171, 175 (Or. Ct. App. 1988)). Granite advocates for a more surety-friendly standard under which the surety is entitled to indemnity unless it made the payment in bad faith. Bad faith under this standard requires an "improper motive or dishonest purpose." PSE Consulting v. Frank Mercede & Sons, 838 A.2d 135, 152 (Conn. 2004) (cleaned up). Negligence or poor judgment is not enough. Id. at 151–52. Courts are divided on which standard should govern, though the standard urged by Granite is the majority position. Id. at 151–52, 151 n.12; see also Mike F. Pipkin et al., The Surety's Indemnity Agreement: Law and Practice 275 (3d ed. 2023) ("Most courts, that have addressed the good faith standard, for example, have

19

held that an indemnitor needs to show more than that the surety exercised bad judgment, or a lack of diligence, or even acted negligently.").

Neither party cites any South Dakota cases discussing what good faith means in the surety/indemnitor context. All contracts in South Dakota contain an implied covenant of good faith and fair dealing. Nygaard v. Sioux Valley Hosps. & Health Sys., 731 N.W.2d 184, 193 (S.D. 2007). Though the meaning of good faith "varies with the context of the contract," the implied covenant allows a plaintiff to sue for breach of contract when the defendant's lack of good faith "limited or completely prevented" the plaintiff from receiving the contract's reasonably expected benefits. Id. at 194 (citation omitted). A plaintiff suing under the implied covenant can recover for breach of contract even when the defendant did not violate the contract's express terms. Id. The duty of good faith has limits, however. Id. It cannot be used to rewrite a contract and "must arise from the language used" or "be indispensable to effectuate" the parties' intent. Id. at 194 (cleaned up and citation omitted). Nor can the duty of good faith "block use of terms that actually appear in the contract." Farm Credit Servs. of Am. v. Dougan, 704 N.W.2d 24, 28 (S.D. 2005) (cleaned up and citation omitted).[12]

This Court need not decide which standard of good faith applies to Granite's conduct because Defendants have failed to establish a dispute of material fact under either standard. Defendants argue that there are issues of material fact on whether Granite "properly issued

---

[12]South Dakota law provides a cause of action for first and third-party insurance bad faith. Sapienza v. Liberty Mut. Fire Ins., 389 F. Supp. 3d 648, 660 (D.S.D. 2019). This Court has predicted that the Supreme Court of South Dakota would allow an obligee to sue a surety for tortious bad faith. Double H. Masonry, Inc. v. Liberty Mut. Ins., CIV 15-5004, 2016 WL 5816997, at *9–11 (D.S.D. Sep. 30, 2016). As this Court explained in a later case, however, Double H. Masonry "does not address the question of whether a party *other* than the obligee may sue the surety for tortious breach of the covenant of good faith and fair dealing." E&I Glob. Energy Servs., Inc. v. Liberty Mut. Sur., 20-CV-04033, 2020 WL 13429353, at *4 (D.S.D. Dec. 18, 2020). Defendants have not brought a claim for tortious bad faith. Doc. 55 at 16.

payments to Yellowstone in the face of hotly contested issues over Yellowstone's nonperformance, including delays, fraudulent test reports, and nonconforming work." Doc. 55 at 12. That Defendants "hotly contested" the payments to Yellowstone, however, does not alone create a genuine dispute of material fact on whether Granite acted reasonably. See Selective Ins. Co. of Am. v. Moseley, No. 19-cv-01054, 2021 WL 3268380, at *10 (D.D.C. July 30, 2021) (finding no question of fact under the more principal-friendly reasonableness standard where the principal disagreed with the surety's decision to pay claims on a bond but failed to offer adequate support for the defenses they raised). Rather, Defendants must offer enough evidence that a reasonable jury could find Granite's payments or investigation were unreasonable. The section of Defendants' brief on Granite's payments to Yellowstone does not include any citations to the record. Doc. 55 at 11–13. Nor does it explain in any detail why Granite's payments or investigation were unreasonable. Id.

This Court has no duty to identify facts in the record that might defeat Granite's motion for summary judgment or to piece together arguments from some of Defendants' lengthy responses to Granite's statement of material facts. Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 915 (8th Cir. 2007); Greenlaw v. United States, 554 U.S. 237, 244 (2008) ("[A]s a general rule, our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." (cleaned up and citation omitted)). Defendants contend in another section of their brief that Granite made payments to Yellowstone "with full knowledge that Mountain Movers had offsets against payments for various deficiencies in Yellowstone's performance, including liquidated damages, equipment rental costs, hoisting activities, [and] nonconforming and incomplete work." Doc. 55 at 3. Defendants cite paragraph 28 of their response to Granite's statement of material facts to support

21

this argument. Id. Paragraph 28, in turn, cites 16 pages of Tollefson's Rule 30(b)(6) deposition. Doc. 53 ¶ 28. In these pages, though, Tollefson merely acknowledged that Granite knew of Mountain Movers' position that it was entitled to offsets due to deficiencies in Yellowstone's work and liquidated damages. Doc. 56-1 at 16–19, 22–24, 26. Granite's knowledge of Mountain Movers' position does not create a genuine issue of material fact on whether Granite's payments to Yellowstone were reasonable. See Selective Ins. Co. of Am., 2021 WL 3268380, at *10 (granting summary judgment where the principal had communicated its objections about bond claims to the surety but did not offer sufficient proof at summary judgment to show these objections were correct).

The arbitrator's findings undermine Defendants' argument that the Yellowstone payments were unreasonable. The arbitrator found that Yellowstone was owed $225,940.92 beyond what Mountain Movers and Granite had already paid, and Defendants eventually agreed to settle the arbitrator's award and remaining claims involving Yellowstone by paying Yellowstone an additional $170,000. Doc. 48, Ex. 47 at 12–13; Doc. 48, Ex. 48; Doc. 45 ¶¶ 77–79; Doc. 53 ¶¶ 77–79. Though Defendants note that the arbitrator's decision "did not resolve all issues between the parties," Doc. 53 ¶ 74, they agreed to waive all their claims against Yellowstone not decided by the arbitrator when they settled with Yellowstone, Doc. 48, Ex. 48. Defendants fail to explain how a jury could find Granite's payments to Yellowstone were improper when the arbitrator ruled that Yellowstone was owed more money than Granite and Defendants had already paid and Defendants agreed to pay Yellowstone at least some of this money.

Defendants also attack Gentry's investigation, arguing that Granite's February 24, 2017 letter to Yellowstone suggests that Granite told Gentry to ignore Mountain Movers' reasons for withholding payments such as liquidated damages, scope of work disputes, and nonconforming

22

work.   Doc. 55 at 4.   Gentry, however, testified that this did not accurately describe his investigation and that he had considered disputes about back charges, project delays, and scope of work.   Doc. 56-2 at 5; Doc. 48, Ex. 52 at 15–16.   There is no dispute that Gentry gathered information from Yellowstone and Mountain Movers about the bond claims and never recommended that Yellowstone be paid the full amount it sought.   Doc. 45 ¶ 35; Doc. 53 ¶ 35; Doc. 48, Ex. 52 at 12–13; Doc. 48, Exs. 31, 34, 37.   Rather, Gentry made deductions for brakes that Yellowstone had not removed, incomplete submittals, work that was only partially complete, and "Extra Work" charges for which Yellowstone failed to provide supporting documentation. Doc. 45 ¶¶ 40, 47–48, 53; Doc. 53 ¶¶ 40, 47–48, 53; Doc. 48, Exs. 31, 34, 37.   He also considered offsets and damages claimed by MM/A-B, identifying potential deductions for liquidated damages and replacement of spillway car motors.   Doc. 45 ¶ 54; Doc. 53 ¶ 54; Doc. 48, Ex. 37.   Defendants have not shown a genuine dispute of material fact on whether Granite's investigation of the bond claims was reasonable.[13]   Granite sought input from the USACE, encouraged the parties to settle, hired an independent consultant, and refused to pay claims Gentry determined Yellowstone was not entitled to.

The Eighth Circuit has interpreted similar language to Section 2 of the Indemnity Agreement to set "a simple cause-in-fact or 'but-for' causation test."   Spirtas, 555 F.3d at 652.   But

---

[13]Though the arbitrator found in Mountain Movers' favor on the Exhibit A scope-of-work issue, Defendants haven't shown that Granite handled this issue unreasonably.   Yellowstone represented to Granite that the scope of work letter and version of subcontract "Exhibit A" that Yellowstone provided were true and accurate.   Doc. 45 ¶ 55; Doc. 53 ¶ 55; Doc. 48, Ex. 37; Doc. 19 at 8. Gentry's May 21, 2018 report attached an email Yellowstone's lawyer sent him discussing messages between MM/A-B and Yellowstone and explaining why Yellowstone's Exhibit A was the correct version.   Doc. 48, Ex. 37.   Moreover, MM/A-B had provided Granite and Gentry copies of the subcontract that included Yellowstone's version of "Exhibit A" in a September 2016 letter and a March 2017 email.   Doc. 45 ¶ 55; Doc. 53 ¶ 55; Doc. 48, Exs. 26, 38.   Gentry had a reasonable basis for deciding in Yellowstone's favor on the Exhibit A issue.

23

for execution of the Fort Peck payment bond, Granite would not have paid $616,370.81 under the bond to Yellowstone. The arbitrator found that Mountain Movers actually owed even more than that to Yellowstone on the Fort Peck project. Granite is entitled to summary judgment on the $616,370.81 in payments it made to Yellowstone.

### 2. Expenses for Bond Claim Investigation, Litigation, and Arbitration

Granite seeks $357,586.32 in attorney's fees and expenses it claims to have incurred in investigating the Yellowstone bond claim and in the related litigation and arbitration in Montana. Granite contends that Tollefson's affidavit constitutes prima facie evidence under Paragraph 5 of the Indemnity Agreement that Defendants are liable for this amount. See Pipkin et al., supra, at 285 (explaining that the effect of a prima facie evidence provision is to "create a presumption in favor of the surety as to the propriety and amount of its payment"). Defendants move to strike the portions of Tollefson's affidavit addressing the attorney's fees and expenses and argue that there are questions of fact about the reasonableness of Granite's claimed fees.[14] This Court addresses the motion to strike first.

Defendants argue that Tollefson's affidavit should be struck because it contains inadmissible evidence and damages information Granite failed to disclose as required by the Federal Rules of Civil Procedure. Rule 26(a)(1)(A)(iii) requires parties to automatically disclose computations of each category of damages they claim and to "make available for inspection and copying as under Rule 34 the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered."

---

[14]Defendants also move to strike the portion of Tollefson's affidavit addressing the fees and costs Granite has incurred in this litigation. As explained below, the Indemnity Agreement does not allow Granite to recover attorney's fees and costs for this case. The portion of Defendants' motion challenging those costs is thus denied as moot. Defendants do not seek to strike the portions of Tollefson's affidavit addressing the $616,370.81 Granite paid to Yellowstone. Doc. 51 at 8.

Parties must supplement their initial disclosures as they learn more information. Fed. R. Civ. P. 26(e)(1). A party who violates these rules may not use evidence they failed to disclose "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Granite's initial disclosures said that it sought recovery of "all fees, costs, and expenses as a result of issuing the bonds to Mountain Movers, including the fees and costs incurred in the arbitration and in the current proceeding." Doc. 52-1 at 5. These initial disclosures did not identify any documents supporting Granite's claim for fees, costs, and expenses incurred in the arbitration or bond investigation. See Doc. 52-1. Discovery requests Defendants issued in April 2025 asked Granite to produce all documents in its possession "related to Mountain Movers, [Yellowstone], the USACE, [and] the Ft. Peck project." Doc. 52-2 at 3. Defendants also asked Granite to produce "letters of engagement, including scope of work, and payments with Kenrich Group and/or any other retained company to provide claim investigation services or other consulting services to Granite for Phases 1 & 2 of Arbitration and this case." Id. at 4. According to Defendants, Granite responded by producing three invoices from the AAA and an engagement letter between Granite and the Kenrich Group. Doc. 52 ¶¶ 7, 9. Defendants contend that Granite violated Rule 26 because other than the three AAA invoices, Granite did not provide any specific amount for attorney's fees or expenses or any documents supporting these alleged damages in its initial disclosures, supplementations, or discovery responses. Id. ¶ 10. Rather, Defendants assert that Tollefson's affidavit—filed after discovery closed—was the first time Granite specified the amounts it was seeking for attorney's fees and expenses. Id.

Granite responds that Defendants have known since the start of this case that Granite sought the fees and expenses it incurred investigating the Yellowstone bond claim and in the related litigation and arbitration. Granite cites a declaration by Tollefson it sent Defendants during

25

the arbitration in March 2023 listing the payments it made to local counsel in Montana, the AAA, and a discovery vendor. Doc. 69-1. Tollefson's declaration also attached a list of payments Granite made to its attorneys and to the Kenrich Group. Id. Granite sent a letter to Defendants in February 2024 listing an updated total amount it was seeking for attorney's fees and costs as part of its demand for indemnity. Doc. 69-2. Granite's complaint sought to recover the attorney's fees and expenses it incurred in the bond claim investigation and the Yellowstone litigation and arbitration. Doc. 1 at 5, 7–8. Granite suggests that the prima facie evidence clause in Paragraph 5 makes disclosure of the underlying invoices and attorney billing records unnecessary. Doc. 67 at 2, 4. Granite also argues that the detailed invoices and billing statements Defendants seek are protected by the attorney-client and work product privileges and thus exempted from disclosure under Rule 26. See Fed. R. Civ. P. 26(a)(1)(A)(iii) (exempting privileged documents from initial disclosures).

Contrary to Granite's argument, the prima facie evidence clause does not make Tollefson's affidavit the final word on attorney's fees. South Dakota law requires that attorney's fees awarded under a contractual fee provision be reasonable even when the contract does not contain such a limitation. In re South Dakota Microsoft Antitrust Litig., 707 N.W.2d 85, 98 (S.D. 2005); Assist Fin. Servs., Inc. v. Freight One Transp., Inc., 20-cv-4015, 2022 WL 392863, at *4 (D.S.D. Feb. 9, 2022) (explaining that contract provisions "are not dispositive" and that the attorney's fees still must be reasonable); see also Spirtas, 555 F.3d at 653–54 (inferring a reasonableness requirement for fees awarded under an indemnity agreement); Pipkin et al., supra, at 224 ("Courts have limited the attorneys' fees awarded based on 'reasonableness,' even though such a standard or limitation is not stated in the indemnity agreement."). Prima facie evidence clauses like Paragraph 5 shift the burden of proof when the surety presents a "voucher or other evidence," but do not bar

26

principals from challenging the reasonableness of the attorney's fees or allow the surety to withhold the records on which the fees are based. See Spirtas, 555 F.3d at 651 n.4, 654 (explaining how a prima facie evidence clause similar to Paragraph 5 operates); Ideal Elec. Sec. Co. v. Int'l Fid. Ins., 129 F.3d 143, 151 (D.C. Cir. 1997) (holding that a prima facie evidence clause is "hardly conclusive with regard to the amount of a reasonable fee award" but simply shifts the burden of proof). Indeed, courts have required sureties to produce attorney billing records so principals could assess the reasonableness of the attorney's fees being sought. See Ideal Elec., 129 F.3d at 146, 150–52 (holding that principal needed "full discovery" of information underlying surety's claim for attorney's fees, including attorney billing records, to assess the reasonableness of the fees and challenge the surety's claim). And while Granite argues that its attorney billing records are privileged, it should have identified the billing records in discovery and could then have asserted the privilege on particular entries if appropriate.

This Court, however, would not exclude Tollefson's affidavit even if Granite violated Rule 26. Exclusion of evidence "is a harsh penalty and should be used sparingly." Gruttemeyer v. Transit Auth., 31 F.4th 638, 645 (8th Cir. 2022) (citation omitted). Exclusion is not appropriate when the failure to disclose was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). And a court may impose lesser sanctions "*on motion*" by the party opposing exclusion. Vanderberg v. Petco Animal Supplies Stores, Inc., 906 F.3d 698, 705 (8th Cir. 2018) (quoting Fed. R. Civ. P. 37(c)(1)).

In discussing harmlessness and justification, both parties cite the four factors courts in the Eighth Circuit consider when fashioning a remedy for a Rule 26(a) violation: "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of

the information or testimony." Gruttemeyer, 31 F.4th at 645 (citation omitted); Doc. 75 at 5; Doc. 67 at 5. Some courts within the Eighth Circuit have analyzed these factors when deciding whether a Rule 26(a) violation was harmless or substantially justified. See, e.g., Hendrickson v. Rapid City, Pierre, & E. R.R., 22-CV-5063, 2024 WL 39072, at *4 (D.S.D. Jan. 3, 2024); Substation K, Inc. v. Kansas City Power & Light Co., 19-cv-00031, 2020 WL 2507344, at *1 (W.D. Mo. Jan. 6, 2020). Other district courts have held that Eighth Circuit case law is silent about the test for justification and harmlessness and that these four factors "apply when fashioning an alternative sanction when a party moves for such in addition to or instead of the self-executing sanction of exclusion, or when exclusion of the evidence is tantamount to dismissal." Niazi Licensing Corp. v. St. Jude Med. S.C., Inc., No. 17-cv-5096, 2020 WL 1617879, at *2 (D. Minn. Apr. 2, 2020) (cleaned up and citation omitted). Still other district courts rely on the Eighth Circuit's decision in Rodrick v. Wal-Mart Stores East, L.P., 666 F.3d 1093 (8th Cir. 2012), where the Eighth Circuit stated that courts deciding whether a Rule 26 violation is justified or harmless should consider "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." Id. at 1097 (citation omitted).

Granite's discovery violation was harmless under all of these standards. There was no surprise to Defendants as they have known since before Granite brought this case and throughout this case that Granite sought to recover the attorney's fees and costs it expended in the Yellowstone litigation and arbitration. See Docs. 1, 69-1. The declaration and attachment Granite provided Defendants in March 2023 sought the same amount for payments to the AAA, Kenrich Group, the discovery vendor, and local counsel as Granite seeks now. Doc. 69-1. Although the attorney's fees requested in the March 2023 communication were $30,251.92 less than the amount Granite

28

seeks here, Defendants still had a rough idea of the amount Granite would claim. Defendants also knew that Granite had not produced any invoices or attorney billing records yet waited until their motion to strike to assert that Granite's initial disclosures and discovery responses were inadequate. Doc. 69 ¶ 5. Rule 37(c) does not require a motion to compel, but courts still consider the moving party's diligence when deciding whether a violation was harmless. See Cash v. State Farm Fire & Cas. Co., 125 F. Supp. 2d 474, 477 (M.D. Ala. 2000) ("[T]he moving party cannot sleep on its rights; it may not wait until the summary judgment stage to object to the use of materials that it has made no prior reasonable efforts to obtain."); Reed v. Sandstone Props., L.P., CV-12-05021, 2013 WL 1344912, at *5 (C.D. Cal. Apr. 2, 2013) ("Federal courts have been reluctant to exclude evidence at summary judgment when a party has slept on her rights in discovery." (cleaned up and citation omitted)); see also United States v. STABL, Inc., 800 F.3d 476, 488 (8th Cir. 2015) (considering party's delay in moving to exclude expert opinion when finding that any discovery violation was harmless).

And any prejudice to Defendants will be minimal. As explained more fully below, this Court is denying summary judgment on the amount of attorney's fees and costs Granite seeks because Granite has not disclosed itemized billing records to Defendants and no final ruling on the reasonableness of the fees and costs can be made without those records. Granite must produce any itemized Kenrich Group and attorney billing records to Defendants or show this Court why they are privileged and what parts in particular are privileged. If Defendants can show good cause to reopen discovery once they receive the records, this Court would consider a motion to do so. See United States ex rel. Graziosi v. R1 RCM Inc., No. 13 CV 1194, 2022 WL 23042879, at *4 (N.D. Ill. Mar. 15, 2022) (finding that a discovery violation was harmless in part because any prejudice

29

could be cured by a limited reopening of discovery). However, some amount of attorney's fees and costs are recoverable under the Indemnity Agreement.

Defendants also argue that some of the paragraphs in Tollefson's affidavit and Exhibit 3 attached thereto are not admissible as business records under Federal Rule of Evidence 803 or as summaries under Federal Rule of Evidence 1006. Tollefson's affidavit says that he reviewed records Granite kept in the ordinary course of business of the payments it made for the Yellowstone arbitration and litigation. Doc. 46 ¶ 3. Exhibit 3 to Tollefson's affidavit lists the consultant fees, attorney's fees, and other payments Granite made in connection with the Yellowstone arbitration and litigation. Doc. 46-3. Tollefson avers in the affidavit that Granite's counsel identified $16,019.05 in fees related to the defense of Yellowstone's bad faith and unfair trade practices claims and that Granite does not seek to recover these fees. Doc. 46 ¶ 11. After Defendants' motion to strike, Granite filed a supplemental affidavit from Tollefson in which he explains that he reviews all legal or consulting invoices before Granite pays them. Doc. 68 ¶ 4. He states that Granite provides the invoices to accounting after he approves them and uses its accounting software to process the invoices. Id. ¶ 6. All the data related to the payment of invoices automatically downloads to Granite's claims system overnight, and Granite retains this payment data in the normal course of its business. Id. ¶¶ 6, 8. According to Tollefson, the list of payments in Exhibit 3 is an export of data directly from Granite's claims system into an Excel spreadsheet. Id. ¶ 9.

Defendants' motion to strike Tollefson's affidavits on evidentiary grounds is denied. The question here is not whether Tollefson's affidavit would be admissible at trial—"it is whether [the evidence of Granite's payments] *could* be presented at trial in an admissible form." Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir. 2012). Rule 56 requires affidavits used to support a

motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Tollefson's affidavits check these boxes, and he could testify at trial about the payments Granite made. See Berkley Ins. Co. v. GTC Const. Mgmt., 17-cv-12330, 2026 WL 1391089, at *6 (D. Mass. May 19, 2026) (holding that court could consider statements about bond-related losses in surety claims handler's affidavit as "reflective of her own personal knowledge"); see also Guar. Co. of N. Am. v. Gary's Grading & Pipeline Co., 746 F. App'x 831, 838 (11th Cir. 2018) (per curiam) (holding that surety employee who handled bond claims had the personal knowledge to testify about amount surety paid, the costs of processing the bond claims, and the attorney's fees incurred in the lawsuit). Tollefson's affidavits also show that Exhibit 3 qualifies as a business record. See Berkley Ins. Co., 2026 WL 1391089, at *6 (holding that itemized statement of bond-related losses would be admissible under the business record exception where affiant's role as surety claims handler and personal knowledge of surety's maintenance of records concerning the losses would qualify her to authenticate the statement).[15]

Having dealt with Defendants' motion to strike, this Court turns to Granite's motion for summary judgment on the attorney's fees and expenses it claims to have incurred in investigating the Yellowstone bond claim and in the related litigation and arbitration. Defendants don't dispute that Granite incurred these fees by reason of having issued the Fort Peck payment bond. See

---

[15] Defendants' response doesn't argue that Tollefson's supplemental affidavit fails to establish that he has personal knowledge of Granite's payments or that Exhibit 3 would be admissible as a business record. Doc. 75 at 7. Rather, Defendants argue that Tollefson's supplemental affidavit still does not provide the information necessary to analyze the reasonableness of Granite's legal fees and whether those fees related to Yellowstone's bad faith and unfair trade practices claims. Id. This Court is not considering the paragraph in Tollefson's affidavit saying that the legal fees Granite seeks do not include fees for defending against Yellowstone's bad faith and unfair trade practices claim.

31

Spirtas, 555 F.3d at 652–53 (holding that principal was liable for attorney and expert witness fees surety incurred in arbitration involving a claim on a surety bond where the indemnity agreement required the principal to reimburse the surety for all expenses incurred "by reason of having executed any bond"). Rather, they argue there are questions of fact on the reasonableness of Granite's fees and expenses and its decision to hire separate counsel to represent it when Defendants were already defending against Yellowstone's claims. Doc. 55 at 14–16. Granite replies that its decision to hire separate counsel was reasonable given the substantial liability it faced and its disagreements with Defendants over how to respond to Yellowstone's claims. Doc. 66 at 11–13.

Questions about the reasonableness of attorney's fees are generally for the court rather than a jury, even when the fees are awarded on a grant of summary judgment. Spirtas, 555 F.3d at 654; see also Crisman v. Determan Chiropractic, Inc., 687 N.W.2d 507, 514 (S.D. 2004) ("This Court has consistently required trial courts to enter findings of fact and conclusions of law when ruling on a request for attorney fees."). The Eighth Circuit in Spirtas, for instance, rejected a principal's argument that summary judgment was inappropriate because there were questions of fact about the reasonableness of the surety's attorney and expert witness fees. 555 F.3d at 654. The Eighth Circuit instead found that the district court had authority to decide whether the surety had participated too extensively in an arbitration involving a claim on the bond. Id. (holding that arguments about the judgment of surety, its attorney, and its experts in participating in the arbitration "involve only the issue we typically entrust to the discretion of the district courts, namely, assessment of the professional judgment exercised in the decision to spend attorney time").

32

This Court denies summary judgment at this time on the reasonableness of Granite's attorney's fees without prejudice to Granite refiling its motion once this Court and Defendants have been able to review the attorney billing records. Proceeding this way will provide Defendants with itemized billing records enabling them to evaluate and possibly challenge the reasonableness of the amount of fees and costs and allow this Court to make an appropriate ruling on reasonableness and what amount Granite is entitled to recover under the Indemnity Agreement for these expenses. See Ideal Elec., 129 F.3d at 151 (holding that principal was "entitled to [billing records] to appraise the reasonableness of the amount of fees requested by [the surety], including the nature and extent of the work done by [the surety's] counsel on various phases of the case, so that it may present to the court any legitimate challenges to [the surety's] claim"); Star Ins. v. A&J Constr. of N.Y, Inc., 15-CV-8798, 2017 WL 6568061, at *7 (S.D.N.Y. Dec. 22, 2017) (holding that the court could not assess reasonableness of legal and consultant fees without documentation).

### 3. Attorney's Fees and Costs Incurred in this Action

The parties dispute whether the Indemnity Agreement allows Granite to recover the attorney's fees and costs it incurred to bring this action. Granite argues that Paragraph 2 of the Agreement covers the attorney's fees because Granite would not have had to sue Defendants but for having issued the Fort Peck payment bond. Doc. 66 at 13–14. Defendants disagree, arguing that Paragraph 2 lacks the express language necessary for Granite to recover attorney's fees for enforcing the Indemnity Agreement. Doc. 55 at 9.

South Dakota follows the American Rule that attorney's fees are not recoverable unless a statute or contract provides otherwise. Black Hills Excavating Servs., Inc. v. Retail Constr. Servs., Inc., 877 N.W.2d 318, 323 (S.D. 2016). "An award of attorney's fees is not the norm," Credit Collection Servs., Inc. v. Pesicka, 721 N.W.2d 474, 476 (S.D. 2006) (citation omitted), and courts

"must have specific authority to depart" from the American Rule, Plains Com. Bank, Inc. v. Beck, 986 N.W.2d 519, 533 (S.D. 2023). Under South Dakota law, a general indemnity provision lacking any reference to litigation between contracting parties does not authorize attorney's fees for an action to enforce the contract. Icehouse, Inc. v. Geissler, 636 N.W.2d 459, 466–67 (S.D. 2001). The indemnity provision in Icehouse obliged the lessee to "indemnify and save [the lessor] harmless from all penalties, claims, demands, liabilities, expenses and losses, of whatever nature, arising from [the lessee's] use of the lease premise[s]" and extended this indemnification to a "reasonable attorney fee incurred by [the lessor] for any litigation to which the Lessor is made a party or threatened to be made a party and which arises out of the use and occupation of the lease premises by [the lessee]." Id. at 466. The Supreme Court of South Dakota held that "[t]hese provisions are generally recognized to provide indemnity when third parties bring an action against the indemnitee, but not, as here, when the dispute is between the two contracting parties." Id. at 466–67 (citing, among other cases, Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 21 (2d Cir. 1996); Hooper Assocs. v. AGS Computs., Inc., 548 N.E.2d 903, 905 (N.Y. 1989)). This holding is consistent with the majority position "presum[ing] that fees incurred in defending an indemnified claim are shifted to the indemnitor while fees incurred in ascertaining the existence of a duty to indemnify are not." Warren Drilling Co. v. Equitable Prod. Co., 621 F. App'x 800, 806 (6th Cir. 2015).

The Supreme Court of South Dakota has affirmed an award of attorney's fees, however, when the language of the indemnity provision clearly shows that the parties intended to include indemnity for fees in litigation between them. Black Hills Excavating, 877 N.W.2d at 323–24. The provision in Black Hills Excavating obliged the subcontractor to "save harmless the Contractor . . . from any and all losses or damage . . . paid or incurred by the Contractor to enforce

34

the provisions . . . occasioned by the failure of the Subcontractor to carry out the provisions of this Subcontract." Id. at 323. The contract also had a separate indemnification provision specifically requiring the subcontractor to indemnify the contractor for attorney's fees from third-party suits. Id. at 324–25. The Supreme Court of South Dakota rejected the subcontractor's argument that Icehouse barred recovery of attorney's fees, explaining that several of the cases cited in Icehouse "recognize that the clear language of the parties' agreement controls and may indicate an intent" to authorize attorney's fees. Black Hills Excavating, 877 N.W.2d at 324 & n.6 (citing Bridgestone/Firestone, Inc., 98 F.3d at 21–22); Hooper Assocs., 548 N.E.2d at 905).[16] Unlike the indemnity provision in Icehouse, the court explained, the contract in Black Hills Excavating "clearly provides for and contemplates litigation between the contracting parties." Black Hills Excavating, 877 N.W.2d at 324.

Paragraph 2 lacks the clear language present in Black Hills Excavating. There is no language expressly requiring indemnity for suits to enforce the Indemnity Agreement, and the agreement does not have a separate indemnity clause specifically targeting third-party claims. See id. at 325 ("[W]hen confronted with indemnification provisions that include both broad indemnity clauses and narrower clauses that specifically target third-party claims, courts have determined that the broad provisions cover claims between the contracting parties, thereby ensuring that neither clause is superfluous." (citation omitted)). Rather, Paragraph 2 could reasonably be read as applying only to claims or suits brought by third parties. Paragraph 2 does not make the clear showing necessary under South Dakota law that the parties intended to require reimbursement for suits between them. See Sioux Falls SD II FGF, LLC v. Courthouse Square, LLP, CIV 21-4043,

---

[16]The court in Black Hills Excavating quoted language from Bridgestone/Firestone, Inc. and Hooper Associates saying that the intent to award attorney's fees for actions between the contracting parties must be "unmistakably clear." Black Hills Excavating, 877 N.W.2d at 324 n.6.

2022 WL 899554, at *2 (D.S.D. Mar. 28, 2022) ("The South Dakota Supreme Court has held that indemnification provisions do not authorize the award of attorneys' fees with regard to claims between the parties to the agreement, unless the language of the provision shows an intent to clearly and unambiguously shift fees." (internal citations omitted)).

Granite does not cite Icehouse, Black Hills Excavating, or any other case applying South Dakota law to determine whether an indemnity provision covers suits between the contracting parties. It does, however, cite two cases concluding that language similar to that in Paragraph 2 is broad enough to authorize attorney's fees for enforcing an indemnity agreement. The district court in Citizens State Bank of Big Lake v. Transamerica Insurance Co., 815 F. Supp. 309 (D. Minn. 1993), for instance, held that an indemnity provision very similar to the one here allowed attorney's fees for a claim to enforce the indemnity agreement. Id. at 311, 313–14. And the Virginia Supreme Court held that an indemnity agreement obliging a subcontractor to "save[] harmless" a construction surety from every loss and counsel fee incurred "by reason of having executed" a performance bond authorized attorney's fees for an action to enforce the agreement. Rappold v. Ind. Lumbermens Mut. Ins., 431 S.E.2d 302, 304–05 (Va. 1993). But not every court interprets language similar to that in Paragraph 2 the same. The court in In re Dvorak, 176 B.R. 929 (Bankr. D. Kan. 1994), held that an indemnity agreement obliging an individual to indemnify the surety for any losses, costs, and attorney's fees the surety incurred "for or by reason or in consequence of the [surety] having become surety on any such bonds" did not cover the surety's attorney's fees for enforcing the indemnity agreement. Id. at 935. Although Citizens State Bank and Rappold show that Granite's reading of Paragraph 2 is plausible, the test in South Dakota is whether the language "clearly and unambiguously" shifts fees. Courthouse Square, 2022 WL 899554, at *2; see also Black Hills Excavating, 877 N.W.2d at 324 n.6 (quoting language from

36

Bridgestone/Firestone, Inc. and Hooper Associates saying that the intent to award attorney's fees for actions between the contracting parties must be "unmistakably clear"). Because Paragraph 2 does not, the American Rule controls and Granite must cover its own attorney's fees for bringing this action.[17]

### B. Mountain Movers' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Relying on a report from its expert Gregory Arnold, Mountain Movers claims that Granite breached the implied covenant of good faith and fair dealing by unreasonably deviating from standard surety practices in three ways. Doc. 19; Doc. 55 at 4–5, 16–17. First, Mountain Movers asserts that Granite violated the duty of care owed Mountain Movers by deciding "clearly disputed issues" and paying Yellowstone despite knowing the issues would be subject to arbitration. Doc. 55 at 5. Mountain Movers doesn't specify what these disputed issues are, but the section of Arnold's report to which it cites concerns Gentry deciding the scope-of-work issue involving Exhibit A in Yellowstone's favor. Doc. 58-1 at 5–7; Doc. 53 ¶ 35. Arnold opines that Granite acted unreasonably by deciding the scope-of-work issue and paying Yellowstone rather than waiting for the arbitrator to resolve the dispute. Doc. 58-1 at 5–6. Second, Mountain Movers contends that Granite ignored the payment terms of its subcontract with Yellowstone when analyzing the bond claims. Doc. 55 at 5, 17. The subcontract provides that Mountain Movers will

---

[17] Granite Re also relies on Spirtas, Pike Creek Chiropractic Ctr., P.A. v. Robinson, 637 A.2d 418 (Del. 1994), and Tubb v. Bartlett, 862 S.W.2d 740 (Tex. App. 1993). These cases do not help Granite Re. Spirtas involved fees incurred defending a claim on a surety bond, not fees for enforcing an indemnity agreement. 555 F.3d at 649–50. The Delaware Supreme Court in Pike Creek adopted Alaska's approach to indemnity clauses, an approach not adopted by the Supreme Court of South Dakota. See Icehouse, 636 N.W.2d at 466–67. And the Texas Court of Appeals in Tubb applied Texas law, which allows an indemnitee to "recover litigation costs incurred while enforcing an indemnity agreement even though such costs are not specifically covered by the agreement." 862 S.W.2d at 751. That is not the law in South Dakota. See Courthouse Square, 2022 WL 899554, at *2.

pay Yellowstone for work "satisfactorily performed" and allows Mountain Movers to withhold payments for untimely work and for Yellowstone's failure to "promptly correct rejected, defective, or nonconforming" work. Doc. 54, Ex. 215. Arnold writes that it was unreasonable for Granite to ignore these terms. Doc. 58-1 at 8. Third, Mountain Movers claims that Granite violated the duty of care owed it by failing to consider "clear evidence" that Yellowstone could not furnish warranties required by the USACE. Doc. 55 at 5. Arnold asserts that Granite acted unreasonably by not withholding payments on the disputed warranty issue until after arbitration. Doc. 58-1 at 9. Mountain Movers argues that whether Granite breached the duty of good faith is a question of fact because it has "presented admissible evidence" from Arnold that Granite unreasonably deviated from standard surety practices. Doc. 55 at 17.

Granite is entitled to summary judgment on Mountain Movers' claim for breach of the covenant of good faith and fair dealing. To start, Granite deciding the disputed scope of work issue is not by itself enough to create a genuine issue of material fact. Paragraph 5 of the Indemnity Agreement gave Granite the right to "pay, settle or compromise any expense, claim or charge of the character enumerated" in the Agreement. Doc. 1-1 at 1. Though Granite must exercise its discretion to pay or settle claims in good faith, Pipkin et al., supra, at 361, Mountain Movers cites no case holding that a surety breaches the duty of good faith and fair dealing simply by paying a disputed claim. Rather, Mountain Movers points to Arnold's opinion that the standard surety practice is to hold back funds on a disputed claim. Arnold in turn to support this opinion cites only to the chapter of a treatise on tort claims for bad faith brought by claimants on a payment bond against a surety. Doc. 58-1 at 6–7 (citing Kevin L. Lybeck et al., The Law of Payment Bonds (2d ed. 2011)). The treatise says that it is "permissible" for a surety to withhold payment and defer to a finder of fact when there is a genuine dispute over liability. Kevin L. Lybeck et al., The Law of

38

Payment Bonds 879–80 (2d ed. 2011); see also id. at 879–81 (explaining that a surety is not "obligated" to rule for either side when there is a genuine dispute and that the surety "may" wait for a trier of fact to resolve the issue). It does not say that it is standard surety practice to withhold payment on disputed claims or that a surety breaches the implied covenant of good faith and fair dealing by paying disputed claims.

In fact, another chapter in the treatise says that the purpose of a right-to-settle clause such as Paragraph 5 of the Indemnity Agreement is to allow the surety to discharge its principal's obligations "despite objection from the principal and indemnitors," and "even if the principal is not liable for the underlying claim." Id. at 745–46. This is consistent with other treatises and case law. See PSE Consulting, 838 A.2d at 157 n.15 (collecting cases and recognizing the "authority holding that a surety is not acting in bad faith in seeking indemnification from a principal simply because the principal objected to and raised colorable defenses to payments made by the surety to the claimant"); Pipkin et al., supra, at 360 ("Courts construing the 'right to settle' provision have often held that the surety's recovery of amounts it paid to settle bond claims is not conditioned upon whether the surety was legally liable under the bond. . . . In other words, under such a provision, a surety may have wide discretion to settle claims made upon a bond even when the principal is not liable for the underlying claim." (footnote omitted)); 3 Bruner & O'Connor on Construction Law § 10:135 n.3 (January 2026 update) ("[I]t is not uncommon for sureties to perform in the face of a dispute as to whether the principal is actually in default. If the surety performs in good faith, the indemnitors are obligated under the terms of the [indemnity agreement]."). It is also consistent with the purpose of right-to-settle clauses and the role of sureties in the construction industry. Sureties provide subcontractors with assurance they will be paid even if the principal defaults. Pipkin et al., supra, at 361. "Small contractors and suppliers

39

in particular depend on prompt payment for their labor, materials, and equipment to stay in business. Enforcement of the surety's right to settle provision promotes these objectives by facilitating prompt settlements of claims and avoiding costly litigation." Id. at 361–62 (footnote omitted); see also PSE Consulting, 838 A.2d at 159 (acknowledging "the public policy supporting the discretion afforded a surety under an indemnity agreement, in that, such agreements make it possible for a surety to compensate unpaid subcontractors and vendors . . . without having to await the adjudication of every possible defense by the principal").

The duty of good faith and fair dealing only "honors a party's *justified* expectations." Dougan, 704 N.W.2d at 29 (cleaned up and citation omitted). Arnold's opinion about surety practices does not establish that Mountain Movers had a justified expectation that Granite would withhold payment on a disputed claim. After all, Paragraph 5 gives Granite the right to settle or pay "any" expense or claim and the law does not support a justified expectation that sureties must await a determination of liability before paying a claim. See Dougan, 704 N.W.2d at 29–30 (rejecting argument that a bank breached the implied covenant of good faith and fair dealing by exercising its discretion under a loan agreement to terminate a line of credit). For the same reason, Arnold's opinion that Granite acted unreasonably by failing to withhold payments on the disputed warranty issue is not enough to create a justified expectation.[18]

Arnold's opinion about Granite ignoring the payment terms of the subcontract fares no better. Arnold assumes that Granite did not consider Mountain Movers' subcontract with Yellowstone because he did not see it discussed in Gentry's reports or Granite's correspondence

---

[18]Gentry identified a potential $39,240 deduction on the warranty issue, Doc. 48, Ex. 37, and Granite held this amount back when it paid Yellowstone, Doc. 45 ¶ 58; Doc. 53 ¶ 58; Doc. 46-2. The arbitrator denied MM/A-B's warranty claims, finding that "the Parties presented no evidence that there were warranty or callback issues related to the Project." Doc. 48, Ex. 47 at 11.

with its attorneys.[19]  Doc. 58-1 at 8.  He opines that this failure to consider the subcontract's payment terms falls short of surety industry standards.  Id.  The only citation Arnold offers in support is a statement in a treatise that a "'surety's conduct lacks justification when it uses improper means to further its own interests to the detriment of [the] principal.'"  Id. (quoting Pipkin et al., supra, at 475 n.90).  That portion of the treatise, however, addresses a surety's tortious interference with contract and cited a district court case, Nat'l Sur. Corp. v. Prairieland Cons., Inc., 354 F. Supp. 2d 1032 (E.D. Mo. 2004), applying Missouri law.  Pipkin et al., supra, at 475 n.90.  Missouri law defines "improper means" as "those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law."  The Vikings, USA Bootheel MO v. Mod. Day Veterans, 33 S.W.3d 709, 711 (Mo. Ct. App. 2000) (cleaned up and citation omitted).  Ignoring the terms of a subcontract falls far short of qualifying as "improper means."

Mountain Movers has also failed to establish a genuine dispute of material fact on damages. Granite argued that Mountain Movers cannot show the alleged breach of the implied covenant caused Mountain Movers damage because Granite paid Yellowstone under a reservation of rights and Mountain Movers was able to seek damages from Yellowstone during the arbitration for delay costs and underperformed or noncompliant work.  Doc. 44 at 22.  Indeed, Mountain Movers received credit in the arbitration award for the offsets from amounts owed Yellowstone, and Granite's payments to Yellowstone did not alter Mountain Movers' ultimate liability to Yellowstone.  A party opposing a properly supported motion for summary judgment like Granite

---

[19]Arnold's assumption is not correct.  Gentry's first report cites to Section 9.2 of the subcontract, one of the same payment terms Arnold says Gentry failed to consider. Doc. 48, Ex. 31 at 2.  Gentry recommended a deduction under Section 9.2 because Mountain Movers had yet to be paid by the USACE.  Id.

makes here "has an affirmative burden to" show a "triable controversy." Garden v. Cent. Neb. Hous. Corp., 719 F.3d 899, 906 (8th Cir. 2013) (citation omitted). Though Mountain Movers would bear the burden of proving damages at trial, its only response to Granite's motion is that a question of fact exists on "whether Granite's payments altered negotiating dynamics, increased defense burdens and costs, or forced the Defendants to incur substantial arbitration expenses to claw back disputed amounts." Doc. 55 at 17. Mountain Movers cites no evidence to support this assertion, and this Court has no duty to guess what that evidence might be. Mountain Movers' speculation about damages is not enough to survive summary judgment. See Garden, 719 F.3d at 906 (holding that party's short statement that its entitlement to attorney's fees was a question of fact was not sufficient to withstand motion for summary judgment where the party offered no evidence on the issue).

The facts not subject to genuine dispute include that Granite hired an outside engineer to investigate and advise on Yellowstone's bond claims, sought information from Defendants on the claims, never paid Yellowstone's claims in full, paid under a reservation of rights, and had under the Indemnity Agreement "the right to pay, settle or compromise any expense, claim or charge" under the bond. Doc. 1-1 at 1; Doc. 45 ¶¶ 35, 44, 58; Doc. 53 ¶¶ 35, 44, 58; Doc. 48, Ex. 52 at 12–13; Doc. 48, Exs. 31, 34, 37. Yellowstone sued Granite and made claims against it in arbitration for not properly paying Yellowstone. In Phase I of the arbitration, after an 11-day evidentiary hearing, the arbitrator concluded that Yellowstone in fact was entitled to more funds on the Fort Peck project than what Granite and Mountain Movers had paid. And, as explained above, Granite is entitled to summary judgment against Defendants for breach of the Indemnity Agreement. Mountain Movers has no viable claim for breach of the implied covenant of good faith and fair dealing under the Indemnity Agreement.

## C. Mountain Movers' Claims for Tortious Interference

Counts 2 and 3 of the Counterclaim allege that Granite tortiously interfered with Mountain Movers' contracts with Yellowstone and the USACE by making improper payments to Yellowstone. Doc. 19 at 11–13. Mountain Movers must show five elements to succeed on its claims for tortious interference with a contract under South Dakota law: (1) a valid contract; (2) Granite's knowledge of this contractual relationship; (3) an intentional and unjustified act of interference by Granite that was improper; (4) proof that Granite's interference caused the harm sustained; and (5) damages. Trigger Energy Holdings, LLC v. Stevens, 29 N.W.3d 900, 919 (S.D. 2025); Gruhlke v. Sioux Empire Fed. Credit Union, Inc., 756 N.W.2d 399, 406 (S.D. 2008). Granite argues that Mountain Movers cannot show a genuine issue of material fact on the last three elements.

As to the third element, courts in South Dakota consider seven non-exhaustive factors from the Restatement (Second) of Torts when deciding whether a party's interference was improper:

> (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

Dykstra v. Page Holding Co., 766 N.W.2d 491, 499–500 (S.D. 2009) (citation omitted). Mountain Movers' improper interference argument relies on Granite's September 2016 letter declining to intervene in the "business dispute" between MM/A-B and Yellowstone because "[t]o do so may subject [Granite] to a claim that our interference prejudiced the rights of either or both parties." Doc. 56-1 at 60. Mountain Movers contends this letter proves that Granite knew interfering in the

dispute would prejudice it, but that Granite interfered anyway once Yellowstone threatened to bring a bad faith/unfair trade practices claim. Doc. 55 at 18–19.

Mountain Movers has failed to show a genuine dispute of material fact on improper interference. Granite sent the September 2016 letter over ten months before making the first payment to Yellowstone. During those ten months, Granite sought guidance from the USACE, encouraged MM-A/B and Yellowstone to settle their disagreements, hired Gentry to independently assess Yellowstone's claims, and gathered more information from both sides. The September 2016 letter does not show that Granite's decision to pay Yellowstone after this investigation was improper. Indeed, the Fort Peck payment bond obligated Granite to pay claims if Mountain Movers refused to do so, Doc. 48, Ex. 8, and Paragraph 5 of the Indemnity Agreement gave Granite the "right to pay, settle or compromise any" claim, Doc. 1-1 at 1.

The Supreme Court of South Dakota has declined to find improper interference when a party acts in accordance with its contract and the applicable laws. See Dykstra, 766 N.W.2d at 500 (finding no improper interference where the defendant bank had a legal right to refuse to subordinate its secured position and did not violate any contractual terms or laws by limiting the disbursements of loan proceeds to plaintiffs). Courts have likewise refused to find improper interference when a surety uses contractual rights to protect its interests. See Gerstner Elec., Inc. v. Am. Ins., 520 F.2d 790, 794–95 (8th Cir. 1975); Zoby v. Am. Fid. Co., 242 F.2d 76, 80 (4th Cir. 1957) (holding that a surety was not liable for malicious interference with a prospective contract when it was "acting normally to limit [its] liability in a situation to which [it] is already a party"); Devs. Sur. & Indem. Co. v. BLB Constr., Inc., No. 2:06cv590, 2008 WL 3819872, at *5 (W.D. Pa. Aug. 11, 2008) (holding that surety exercising right under indemnity agreement to progress payments was justified and not tortious interference with a contractual relationship); Artnz

44

Contracting Co. v. St. Paul Fire & Marine Ins., 54 Cal. Rptr. 2d 888, 897 (Cal. Ct. App. 1996) (holding that the surety's "exercise of contractual rights . . . and truthful statements to interested parties about one's standard business practices . . . is not wrongful conduct actionable as intentional interference with prospective economic relations"). In Gerstner, for instance, the Eighth Circuit held that a surety was justified in asking the project owner to withhold payments to the principal pending litigation of a subcontractor's bond claim. 520 F.2d at 794–95. The principal had refused to pay the subcontractor because of a dispute over back pay and the indemnity agreement authorized the surety to "take any action it might deem appropriate" if the principal failed to pay for labor. Id. at 792. Recognizing the principal's interest in protecting itself on the bond claim, the Eighth Circuit found no contractual interference. Id. at 794–95. Granite's motive for paying Yellowstone was to protect its interests and perform its contractual obligations, not to interfere with Mountain Movers' contracts with Yellowstone and the USACE. Granite is entitled to summary judgment on Mountain Movers' counterclaims for tortious interference.

## IV. Conclusion

For the reasons stated above, it is

ORDERED that Granite's Motion for Summary Judgment, Doc. 43, is granted in part and denied in part as explained above. It is further

ORDERED that Defendants' Motion to Strike Portions of the Affidavit of Brand Tollefson, Doc. 50, is denied. It is further

ORDERED that Granite's Motion to Strike the Declaration of Paul Bailey, Doc. 62, is denied as moot.

DATED 14ᵗʰ day of July, 2026.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE